# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KEITH GUINDON, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | CASE NO.     1:15-cv-02256-BJR |
| | ) | |
| *v.* | ) | **ORDER GRANTING PLAINTIFFS'** |
| | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT IN PART AND DENYING** |
| | ) | **DEFENDANTS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT IN PART** |
| PENNY SUE PRITZKER, in her official | ) | |
| capacity as Secretary of the United States | ) | |
| Department of Commerce; NATIONAL | ) | |
| OCEANIC AND ATMOSPHERIC | ) | |
| ADMINISTRATION; and NATIONAL | ) | |
| MARINE FISHERIES SERVICE, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## I.      INTRODUCTION

This case represents the latest chapter in the management of the red snapper fishery in the Gulf of Mexico.  Plaintiffs, commercial fishermen and their affiliated business entities and trade associations, bring this action against Defendants United States Secretary of Commerce, ("Secretary"), the National Oceanic and Atmospheric Administration, ("NOAA"), and the National Marine Fisheries Service, ("NMFS").  Plaintiffs assert claims under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1884 (2012), the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* (2012), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2012).

Presently before the Court is Plaintiffs' Motion for Summary Judgment and Defendants' Motion for Summary Judgment.  Having reviewed the parties' briefs, the administrative record, and the relevant authority, and having heard oral argument, the Court GRANTS Plaintiffs' Motion for Summary Judgment in part.  The Court's reasoning follows.

## II.   BACKGROUND

### A. *Statutory Background.*

#### 1.   Magnuson-Stevens Fishery Conservation and Management Act.

In 1976, Congress enacted the MSA to, among other things, "conserve and manage the fishery resources found off the coasts of the United States," and "promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(1), (3). To accomplish those goals, the MSA divides the country into eight regions, and establishes a council in each region to manage the region's marine fisheries. *See id.* § 1852. Each council then prepares and submits to the Secretary a Fishery Management Plan ("FMP") and, over time, necessary amendments to the plan that aim to "achieve and maintain, on a continuing basis, the optimum yield from each fishery." *Id.* §§ 1801(b)(4), 1852(h)(1).

The MSA imposes several requirements for FMPs and amendments. Specifically, an FMP or amendment must contain measures "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A). FMPs and amendments additionally must conform to ten National Standards established by the MSA. *Id.* § 1851(a). Two of those National Standards are relevant here:

> Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry. ("National Standard One").

> If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges. ("National Standard Four").

*Id.* § 1851(a)(1), (4).

Furthermore, any FMP or amendment related to the red snapper fishery is governed by section 407 of the MSA.  Section 407(d)(1) requires that any FMP, amendment, or implementing regulation must contain conservation and management measures that "establish separate quotas for recreational fishing . . . and commercial fishing that, when reached, result in a prohibition on the retention of fish caught during recreational fishing and commercial fishing, respectively, for the remainder of the fishing year."  *Id.* § 1883(d)(1).  Section 407(d)(2) provides that any FMP, amendment, or implementing regulation establishing quotas for recreational and commercial fishing must ensure that "such quotas reflect allocations among such sectors and do not reflect any harvests in excess of such allocations."  *Id.* § 1883(d)(2).

After preparing an FMP or amendment, a council submits it to the NMFS, which acts in practice on behalf of the Secretary, for review.  *See generally id.* § 1854.  NMFS reviews the submission for consistency with the MSA and solicits public comments for sixty days.  *Id.* § 1854(a)(1)(A)-(B).  Within thirty days of the end of the comment period, NMFS shall approve, disapprove, or partially approve the FMP or amendment.  *Id.* § 1854(a)(3).  If NMFS approves, a final rule is published in the Federal Register.  *See id.* § 1854(b)(3).  Approved FMPs or amendments are subject to judicial review within thirty days under the APA.  *See id.* § 1855(f)(1).

2. National Environmental Policy Act.

NEPA requires an agency to "consider every significant aspect of the environmental impact of a proposed action" and "inform the public that it has indeed considered environmental concerns in its decisionmaking process."  *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotation marks omitted).  To comply with those obligations, agencies must prepare an Environmental Impact Statement, ("EIS"), in which the agency takes a "hard look" at the environmental consequences before taking major action.  *Id.*; *see also* 42 U.S.C.

§ 4332(C).  An EIS must "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts . . . of the human environment."  40 C.F.R. § 1502.1; *see also id* § 1502.14(a) (explaining that an agency must "rigorously explore and objectively evaluate all reasonable alternatives").

**B.  Factual Background.**

1.  <u>The Gulf of Mexico Red Snapper Fishery.</u>

The Gulf of Mexico Fishery Management Council, (the "Gulf Council"), manages red snapper in the Gulf of Mexico.  16 U.S.C. § 1852(E).  The management unit for red snapper extends from the United States-Mexico border in the west through the northern Gulf of Mexico waters and west of the Dry Tortugas and the Florida Keys.  AR 001486.  Although managed as a unit, two primary sub-stocks of red snapper reside in the Gulf of Mexico: one sub-stock resides in the Eastern Gulf and the other in the Western Gulf, separated by the Mississippi River.  *Id.*

Management of red snapper began in the 1980s with the implementation of the Reef Fish Fishery Management Plan, ("Reef Fish FMP").  AR 000006.  At that time, routine assessments indicated that red snapper was in decline, or in an overfished condition.  AR 020348.  In efforts to rebuild the stock, the Gulf Council adopted Amendment 1 to the Reef Fish FMP.  Amendment 1, among other things, specified a framework for setting the total allowable catch ("TAC") to allow for annual management changes.  AR 020333.[1]  Amendment 1 additionally indicated how the TAC would be allocated between the commercial and recreational sectors in the fishery.  *Id.* Amendment 1 allotted 51 percent to the commercial sector and 49 percent to the recreational sector based on percentages of total landings during a base period from 1979 to 1987.  *Id.*

---

[1]      TAC, acceptable biological catch, ("ABC"), and annual catch limit, ("ACL") are equivalent terms referring to the total amount of red snapper that can be harvested each year.  AR 020348.

In managing the fishery, the Gulf Council and NMFS rely on the Southeast Data, Assessment and Review, ("SEDAR"), stock assessment, a periodic evaluation of the amount and weight of fish, spawning data, mortality rates, and other information related to the size and health of the fishery. *See, e.g.*, AR 001482. Once a SEDAR stock assessment is conducted, the Gulf Council's Scientific and Statistical Committee, ("SCC"), reviews the assessment and recommends to the Gulf Council the acceptable biological catch, ("ABC"), for the year. AR 000010-12. The Gulf Council then proposes to NMFS a total quota for the year that is then divided according to the 51/49 allocation. *Id.*

2.  Management of the Commercial Sector.

Between 1990 and 2006, the Gulf Council and NMFS managed the commercial sector by setting quotas at 51 percent of the TAC and closing the fishing season once the quota was reached. AR 020354. As a result, the commercial sector operated like a derby: commercial fishermen raced to catch as many fish as possible before the fishery closed. AR 039012-039013. That resulted in short seasons, overages, and economic instability. *Id.*

In 2007, the commercial sector implemented an individual fishing quota, ("IFQ"), program. *See* 71 Fed. Reg. 67,447, 67,447 (Nov. 22, 2006). The IFQ program works as follows: (1) Each qualifying vessel receives shares of the commercial quota based on the vessel's historical participation in the fishery; (2) At the start of each season, each shareholder receives an allocation in pounds based on the amount of shares they have; and (3) Each shareholder may then harvest his allocation, purchase allocation from other fishermen, or sells his allocation to others. AR 020354. Since implementing the IFQ program, the commercial sector has not exceeded its quota, and the commercial fishing season operates year round. AR 020350.

3.   Management of the Recreational Sector.

Managing the recreational sector has proven more difficult.  Beginning with Amendment 1 to the Reef Fish FMP, the Gulf Council and NMFS did not initially establish a quota for the recreational sector.  Instead, Amendment 1 specified a recreational allocation in pounds that was based on 49 percent of the TAC.  As such, from 1991 until 1997, the Gulf Council and NMFS set an allocation of red snapper for the recreational sector each year, and managed the recreational sector through bag and size limits with a year-round open season.  *See, e.g.*, 56 Fed. Reg. 33,883 (July 24, 1991).  During those six years, the recreational sector exceeded their allocation every year, except 1996.  AR 020353.

In 1997, the Gulf Council and NMFS established a quota for the recreational sector.  *See* 62 Fed. Reg. 42,478, 42,479 (Aug. 7, 1997).  From 1997 to 1999, the Gulf Council and NMFS implemented in-season monitoring and a season-closure process to keep the recreational sector within their quota.  AR 020351.  Closures occurred in 1997, 1998, and 1999, with seasons becoming shorter each year.  *Id.*  In 2000, the Gulf Council and NMFS abandoned in-season monitoring and set a fixed season length for the recreational sector.  *See* 65 Fed. Reg. 50,158, 50,158 (Aug. 17, 2000).  From 2000 until 2007, the recreational sector operated under a quota of 4.47 million pounds and a season lasting from April 21 to October 31 (194 days).  *Id.*

In 2008, the recreational sector began operating under variable season lengths.  AR 020351.  This meant that the Gulf Council and NMFS predicted the recreational catch rate in advance using past trends and changes in the average size of recreationally harvested red snapper.  *Id.*  The recreational season then began each year on June 1 and closed on the date when the quota was projected to be reached.  *Id.*  During this period (2008-2012), the recreational sector exceeded their quota every year, except 2010.  AR 020353.

According to Defendants, lack of real-time data on recreational landings complicates efforts to determine recreational fishing seasons.  (Doc. No. 22, at 13).  Prior to 2008, NMFS collected data on the recreational sector through the Marine Recreational Fishery Statistics Survey, which generated effort and catch data through onsite interviews with anglers and offsite telephone surveys.  AR 000573-74.  In 2008, NMFS implemented an improved recreational data collection program, called the Marine Recreational Information Program, ("MRIP").  AR 020693.  In 2013, NMFS updated MRIP protocols to include data from fishing trips at time intervals that the agency had not previously sampled, resulting in higher estimates of recreational landings and discards.  *Id.*

    4.  *Prior Litigation:* Guindon v. Pritzker (Guindon I), *31 F. Supp. 3d 169 (D.D.C. 2014).*

The issue of NMFS's management of the recreational sector came to a head when Plaintiffs brought suit against Defendants concerning the 2013 recreational season.  In *Guindon v. Pritzker (Guindon I)*, 31 F. Supp. 3d 169 (D.D.C. 2014), Plaintiffs challenged, among other things, NMFS's action to set a 28-day season in 2013 and then reopen the season in the fall after the recreational sector had already reached and exceeded their quota.  *Id.* at 181-185.  Ruling in Plaintiffs' favor on all of their MSA claims, the Court focused on NMFS's repeated failure to hold the recreational sector accountable.  *Id.* at 200-201.

In response to the Court's decision, NMFS took three actions relevant to the present case. First, for the 2014 season, NMFS set a target catch level for the recreational sector that was 20 percent below the recreational quota and reduced the recreational season to nine days.  *See* 80 Fed. Reg. 14,328, 14,328 (Mar. 19, 2015); *see also* 79 Fed. Reg. 27,768, 27,769 (May 15, 2014).  NMFS subsequently promulgated a Final Rule that permanently established a recreational catch level with a 20 percent buffer and a quota overage adjustment that would reduce the recreational quota the year following a quota overage by the amount of that overage.  *See* 80 Fed. Reg. at 14,328.

Second, having modified its MRIP protocols in 2013 and believing the modified protocols to be the most accurate means of measuring recreational landings, NMFS convened a calibration workshop to adjust prior recreational landings to reflect what those landings would have been under the modified MRIP protocols.  AR 001461-001481.  The MRIP calibration revealed higher historical recreational landings.  AR 020360.

Third, as mentioned, the Gulf Council and NMFS rely on the SEDAR stock assessment each year.  In 2014, the SEDAR stock assessment was updated to include the calibrated historical recreational landings.  AR 020331.  After reviewing the 2014 update to the SEDAR stock assessment, the SSC determined that the ABC could be increased to 13 million pounds in 2015 with further increases over the next two years.  *Id.*  In February 2015, the SSC received an additional update to the 2014 SEDAR stock assessment that included the 2014 landings, which were lower than previously assumed.  *Id.*  As a result, the SSC re-evaluated its projections and recommended that the ABC be adjusted to 14.3 million pounds in 2015, 13.96 million pounds in 2016, and 13.74 million pounds in 2017.  *Id.*  The Gulf Council then approved a framework action to implement commercial and recreational quotas derived from the ABC levels.  *See* 80 Fed. Reg. 24,832, 24,832 (May 1, 2015).

### 5.   The Challenged Agency Action: Amendment 28 to the Reef Fish FMP.

The new, higher ABC levels, established as a result of the revised 2014 update to the SEDAR stock assessment that made use of the MRIP calibration, informed the then-ongoing efforts by the Gulf Council to reconsider the appropriate allocation between the commercial and recreational sectors, leading to the adoption and implementation of Amendment 28.  AR 020320. Amendment 28 initially aimed to "consider changes to the commercial and recreational red snapper allocation to increase the net benefits from red snapper fishing."  78 Fed. Reg. 66,900,

66,900 (Nov. 7, 2013).  Pursuant to that purpose, the Gulf Council considered alternatives that would have shifted allocation from the recreational sector to the commercial sector.  AR 020722.  After learning that it was not possible to determine changes in economic benefits and receiving information from the MRIP calibration, the Gulf Council modified the purpose of Amendment 28 to the following: "reallocate the red snapper harvest consistent with the 2014 red snapper assessment update to ensure the allowable catch and recovery benefits are fairly and equitably allocated between the commercial and recreational sectors to achieve optimum yield."  AR 020332.

The Gulf Council considered nine alternatives for adjusting the red snapper allocation.  Notably, the Gulf Council evaluated a "no action" alternative, which would have retained the allocation established in Amendment 1.  AR 020335.  The Gulf Council determined that the "no action" alternative would have been the most "environmentally preferable alternative" because it would have resulted in the "least commercial discards and . . . the lowest decrease [in the spawning potential ratio, ("SPR"),] for the eastern portion of the red snapper stock."  AR 020730-AR 020731.  Ultimately, the Gulf Council approved Alternative 8, which reallocates the TAC of red snapper from the commercial sector to the recreational sector, giving as its reason for doing so, the increase in allowable harvest due to changes in recreational landings data from the 2014 update assessment.  AR 020326.  Amendment 28 thus modifies the original allocation from 51 percent commercial and 49 percent recreational to 48.5 percent commercial and 51.5 percent recreational.

### C.  Procedural Background.

The Gulf Council submitted Amendment 28 to NMFS for review on December 18, 2015.  AR 020646.  NMFS published a Notice of Availability for Amendment 28 on December 24, 2015 for a sixty-day notice and comment period.  AR 020657-58.  In the interim, NMFS published a

regulatory framework action to hold back quota from the commercial sector in anticipation of NMFS's decision to approve, disapprove, or partially approve Amendment 28.  *See* 80 Fed. Reg. 73,999 (Nov. 27, 2015).[2]  On January 25, 2016, NMFS published a Proposed Rule to implement Amendment 28.  *See* 81 Fed. Reg. 4,010.  And, on April 28, 2016, NMFS published a Final Rule to implement Amendment 28.  *See* 81 Fed. Reg. 25,576.

On December 28, 2015, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief challenging Amendment 28 to the Reef Fish FMP.  (Doc. No. 1).  On January 15, 2016, parties filed a Joint Motion to Stay in anticipation that Defendants would approve and implement Amendment 28, thereby requiring Plaintiffs to file a supplemental complaint to challenge the rulemaking. (Doc. No. 9). The Court granted the stay. (Doc. No. 10).  On May 6, 2016, Plaintiffs filed a consented-to Motion for Leave to File Supplemental Complaint, for Expedited Procedures and for Entry of Case Deadlines. (Doc. No. 11).   The Court granted that Motion, deeming Plaintiffs' Supplemental Complaint filed on May 9, 2016.  (Doc. No. 12).

Plaintiffs filed their Motion for Summary Judgment on July 15, 2016.  Defendants filed their Motion for Summary Judgment on September 2, 2016.  The Court heard oral argument on the motions on January 25, 2017.  In their Motion for Summary Judgment, Plaintiffs assert that Amendment 28 violates MSA section 407(d)(2); MSA section 303(a)(1)(A) and certain primary objectives of the Reef Fish FMP; (3) MSA National Standard Four and the Gulf Council's Fishery Allocation Policy; (4) MSA National Standard One and the Gulf Council's Fishery Allocation Policy; (5) MSA section 303(a)(14); (6) MSA section 303(a)(9); and (7) NEPA.

---

[2]      Plaintiffs refer to this regulatory action as the Quota Holdback Rule.  (Doc. No. 11-2, at 6).  Plaintiffs' initial and supplemental complaint challenged the Quota Holdback Rule, however, Plaintiffs' Motion for Summary Judgment states that they are not moving for summary judgment on the Quota Holdback Rule at this time.  Because the Court finds that Amendment 28 violates National Standard Four, the Court need not resolve whether Plaintiffs abandoned its cause of action to challenge the Quota Holdback Rule.

### III.    LEGAL STANDARD

Federal Rules of Civil Procedure Rule 56(a) provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  When reviewing agency actions, however, the standard articulated under Rule 56(a) does not apply because of the "limited role of a court in reviewing the administrative record."  *See North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *See id.*

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The scope of review under the APA is "narrow," and a court may not "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency acts arbitrarily and capriciously "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to difference in view or the product of agency expertise."  *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1144-45 (D.C. Cir. 2005) (internal quotation marks omitted); *see also State Farm*, 463 U.S. at 43 (explaining that a reviewing court must be satisfied that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation marks omitted).

"Judicial review of agency action under the MSA is especially deferential." *North Carolina Fisheries Ass'n*, 518 F. Supp. 2d at 79.  When a party challenges a FMP or FMP amendment as inconsistent with one of the National Standards set forth in the MSA, a court's "task is not to review *de novo* whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1562 (D.C. Cir. 1991).  Courts therefore should "defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the [MSA] charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors." *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990).

In reviewing the agency's interpretation of certain MSA provisions, the Court is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  As explained by the D.C. Circuit,

> Under the first step of *Chevron*, the reviewing court must first exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue.  The traditional tools include examination of the statute's text, legislative history, and structure as well as its purpose. This inquiry using the traditional tools of construction may be characterized as a search for the plain meaning of the statute.  If this search yields a clear result, then Congress has expressed its intention as to the question, and deference is not appropriate.  If, however, the statute is silent or ambiguous with respect to the specific issue, Congress has not spoken clearly, and a permissible agency interpretation of the statute merits judicial deference.

*Bell Atl. Tel. Companies. v. FCC*, 131 F.3d 1044 (D.C. Cir. 1997) (citations and internal quotation marks omitted); *see also Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000) ("Although agencies are entitled to deferential review under *Chevron* Step Two, our judicial function is neither rote nor meaningless.").

Under NEPA, a reviewing court must "ensure that the agency has adequately considered and disclosed the environmental impact of its actions" and "that its decision is not arbitrary or capricious." *Baltimore Gas & Electric Co.*, 462 U.S. at 97-98; *see also Nevada v. Dep't of Energy*, 457 F.3d 78, 87-88 (D.C. Cir. 2006) (reviewing the agency's procedural compliance with NEPA under APA's arbitrary and capricious).

## IV.     DISCUSSION

Preliminarily, Plaintiffs assert, and Defendants do not dispute, that they have standing to bring this action.  Given that this point is uncontested, and one that has been resolved in favor of Plaintiffs in their previous litigation that challenged NMFS regulations, *see Guindon I*, 31 F. Supp. 3d at 186-87, the Court sees no reason to deny standing here.  *See Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) ("In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it.").  The Court now turns to the merits of Plaintiffs' complaint.

### A.  *Amendment 28 Violates MSA National Standard Four.*

As the D.C. Circuit has summarized, National Standard Four sets forth "three requirements that must be met whenever an FMP allocates fishing privileges: (i) the allocation must be fair and equitable; (ii) it must be reasonably calculated to promote conservation; and (iii) it must not allocate an excessive share of privileges to any particular group."  *C & W Fish*, 931 F.2d at 1563. Implementing regulations provide that an allocation "should be rationally connected . . . with the furtherance of a legitimate objective" and recognize that "[i]nherent in an allocation is the advantaging of one group to the detriment of another." 50 C.F.R. § 600.325(c)(3)(i)(A); *see also id.* § 600.325(c)(3)(i)(B) (allocations may "impose a hardship on one group if it is outweighed by

the total benefits received by another group").[3]   Additionally, an allocation is "reasonably calculated to promote conservation" if an allocation encourages a "'rational, more easily managed use of the resource.'"  *C & W Fish*, 931 F.2d at 1564 (quoting 50 C.F.R. § 600.325(c)(3)(ii)).

Plaintiffs argue that Amendment 28 violates National Standard Four because it imposes a hardship on the commercial sector that is not outweighed by the total benefits received by the recreational sector. (Doc. No. 18, at 30).[4]  According to Plaintiffs, the stated benefits of "additional recreational opportunities" may be illusory while the harms to the commercial sector are assured. AR 020328; *see also* AR 020081 ("Whatever amount of quota is reallocated to the recreational sector could be absorbed completely by additional fishing in state waters from non-compliant state seasons."); AR 020082 ("[R]eallocation imposes millions of dollars of direct and indirect losses on the commercial sector and the seafood supply chain.").   In response, Defendants claim that Amendment 28 "benefits the recreational sector as a whole."  (Doc. No. 22, at 28).  While the benefits to the recreational sector are difficult to quantify, Defendants explain, the record is clear that "the gains in recreational quota would provide additional recreational opportunities to retain red snapper," and that "each additional fish made available for harvest by the sector has value to the sector."  AR 020411, AR 020856.

Additionally, Plaintiffs contend that Amendment 28 fails to promote conservation because it does not encourage a "rational, more easily managed use" of the resource.  *See* 50 C.F.R. § 600.325(c)(3)(ii).  Amendment 28, Plaintiffs explain, reallocates quota from the rationalized

---

[3]   Although the guidelines interpreting the MSA are not entitled to automatic *Chevron* deference, because "they do not carry the force of law," *Oceana Inc. v. Locke*, 831 F. Supp. 2d 95, 117 (D.D.C. 2011), "the guidelines are entitled to 'considerable deference' in light of their thoroughness, the agency's expertise, and the administrative formalities involved in their promulgation," *Guindon I*, 31 F. Supp. 3d at 198.

[4]   Plaintiffs additionally argue that Amendment 28 does not further a primary objective of the FMP to rebuild stocks wherever they occur in the fishery because reallocation would hasten the depletion of the red snapper stock in the Eastern Gulf. (Doc. No. 24, at 13).  This argument does not amount to a violation under National Standard Four. As explained in succeeding sections, Defendants manage the red snapper fishery as a Gulf-wide unit, and declines in the Eastern Gulf will not thwart the Gulf-wide rebuilding plan.

limited access commercial sector, which has no management uncertainty, to the non-rationalized open access recreational sector, which has many sources of management uncertainty.  (Doc. No. 18, at 30).  Defendants disagree, averring that Amendment 28 promotes conservation because adoption and implementation of the 20 percent buffer will improve "management certainty" within the recreational sector.  (Doc. No. 22, at 29).

Defendants also claim that Amendment 28 will maintain a fair and equitable distribution of recovery benefits between the commercial and recreational sectors because the reallocation addresses a "change in methodology" that indicates "that recreational harvests have been underestimated and that the red snapper fishery is more productive than previously thought." (Doc. No. 25, at 13).  Amendment 28 reconciles the prior underestimates of recreational harvests by allotting to the recreational sector "the quantifiable increase in the total allowable harvest attributable to the calibration of recreational landings data based on the new methodology."  (*Id.*).

While Defendants are persuasive in their rebuttal of Plaintiffs' aforementioned critiques, Defendants have failed to convince the Court that the proposed allocation meets the "fair and equitable" requirement of MSA National Standard Four.  This Court, like other courts in this district, will not second guess the agency's judgment merely because an allocation has a greater impact on one group of fishermen.  *See, e.g.*, *C & W Fish*, 931 F.3d at 1564 (upholding amendment banning drift gillnet technique despite burdening fishermen who use that technique); *Van Valin v. Locke*, 671 F. Supp. 2d 1, 10-11 (D.D.C. 2009) (upholding amendment that imposed restrictions only on guided sport sector to curb that sector's overharvesting); *North Carolina Fisheries Ass'n,* 518 F. Supp. 2d at 91 (upholding amendment that aimed to end overfishing despite disfavoring fishermen of the snapper-grouper fishery); *Nat'l Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 132 (D.D.C. 2002) (upholding fishing closure despite disadvantaging fishermen

who lived near closed areas because the closure reduced bycatch); *Nat'l Fisheries Inst.*, 732 F. Supp. at 225-226 (upholding amendment that conserved billfish despite burdening commercial fishermen). Indeed, National Standard Four and its implementing regulations permit allocations that sacrifice the interests of one group of fishermen to benefit the fishery as a whole. 50 C.F.R. § 600.325(c)(3)(i)(A)-(B).

Given the revised MRIP methodology employed by Defendants, it is reasonable for Defendants to pursue a new allocation for the red snapper stock. It is also reasonable for Defendants to reexamine past sector landings and reallocate based on their findings. In fact, Amendment 1 to the Reef Fish FMP did exactly that: NMFS examined the landings of the commercial sector and recreational sector during a base period from 1979 to 1987, and allocated 51 percent of the TAC to the commercial sector and 49 percent to the recreational sector based on that data.

Amendment 28, however, differs from Amendment 1 in that it contains a fundamental flaw. As explained by Defendants, Amendment 28 increases the original allocation to the recreational sector in efforts to "reconcile prior underestimates" using the revised MRIP methodology. (Doc. No. 22, at 29). Stated differently, Amendment 28 enables the recreational sector to catch more fish in the future because they caught more fish in the past, in excess of applicable restrictions. AR 020353 ("During the period when the recreational harvest was managed as a quota (1997-2012), actual recreational harvest in pounds of red snapper exceeded the quota in 9 out of 16 years, including 5 of the last 6 years."). Consequently, Defendants create a system in which one sector must demonstrate an increase in landings in excess of their quota in order to obtain an increase in their allocation. The flaw with that system is that the commercial sector can never obtain an increase in their allocation because the commercial sector can never exceed their quota due to the

IFQ program.  AR 020354 ("[T]he IFQ program has ended quota overruns.").[5]  Amendment 28

therefore places the commercial sector at a *permanent* disadvantage by failing to take into account

the IFQ program and its impact on reallocation.  The Court cannot deem such a scenario fair and

equitable as required by National Standard Four.[6]

### B. Amendment 28 Complies with the Remaining MSA Provisions.

#### 1. Section 407(d)(2) of the MSA.

Section 407(d) of the MSA, which specifically governs the red snapper fishery, provides

as follows:

> Any [FMP], plan amendment, or regulation submitted by the Gulf Council for the
> red snapper fishery after October 11, 1996, shall contain conservation and
> management measures that—
>
> (1) establish separate quotas for recreational fishing (which, for the purposes of this
> subsection shall include charter fishing) and commercial fishing that, when
> reached, result in a prohibition on the retention of fish caught during
> recreational fishing and commercial fishing, respectively, for the remainder of
> the fishing year; and
>
> (2) ensure that such quotas reflect allocations among such sectors and do not reflect
> any harvests in excess of such allocations.

---

[5]       Under the IFQ program, each participant holds fixed privileges to catch specific portions of the catch.  *See generally* 50 C.F.R. § 622.21.  Strict monitoring and reporting requirements further ensure that catch limits are adhered to.  *See generally id.*

[6]       Plaintiffs additionally argue that Amendment 28 violates the Gulf Council's Fishery Allocation Policy, which requires that any reallocation must "consider efficient utilization of fishery resources" but "should not just redistribute gains and burdens without an increase in efficiency."  AR 020576.  Plaintiffs argue that Defendants violated this requirement by failing to conclude definitively whether Amendment 28 would increase or decrease efficiency.  (Doc. No. 18, at 31) ("Amendment 28 merely redistributes gains and burdens without an increase in efficiency.") (internal quotation marks omitted).  In response, Defendants contend that they assessed efficiency in qualitative terms, concluding that Amendment 28 "would benefit the recreational sector because each individual fish made available for harvest by the recreational sector has value to the sector."  (Doc. No. 22, at 30).

Assuming arguendo that the Gulf Council's Fishery Allocation Policy is binding, the Court defers to Defendants' interpretation of what is required under the Allocation Policy.  *See Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, 846 F.3d 99, 109-110 (5th Cir. 2017) (explaining that the agency is not required to acquire or produce plaintiffs' preferred data and that the National Standards do not require analysis of unavailable data); *see also* 50 C.F.R. § 600.315(e)(2) ("The fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP.").

16 U.S.C. § 1883(d).  Plaintiffs argue that Amendment 28 "reallocates to the recreational sector the amount of projected quota increase estimated to result from the recalibration of recreational landings estimates." (Doc. No. 18, at 19) (quoting AR 02078).  The recalibration of recreational landings estimates, Plaintiffs explain, reflects the recreational sector's prior overharvesting.  (Doc. No. 24, at 7).  Therefore, according to Plaintiffs, Amendment 28 violates section 407(d)(2) because it establishes a quota for the recreational sector that reflects "harvests in excess of such allocations."

Defendants contend that by its "plain terms and context, section 407(d)(2) requires that the quota established for the recreational sector pursuant to subsection (d)(1) reflect any established allocation to that sector."  (Doc. No. 22, at 20).  That is because, Defendants explain, NMFS linked the sector allocations to the sector quotas in 1997, thereby ensuring "that any future changes to quotas, as occurred in the Final Rule implementing Amendment 28, reflect the commercial and recreational allocations and no harvest in excess of those allocations."  (*Id.*).

Although the Court has not identified any case defining or applying section 407(d)(2), nothing in the statute compels Plaintiffs' interpretation.  Indeed, the new recreational quota is based on increases from the MRIP calibration, which, in turn, reflect the recreational sector's prior overharvesting.  Plaintiffs, however, read too much into section 407(d)(2).  Section 407(d)(2) does not instruct the agency on what should or should not form the basis of a quota.

Accordingly, the Court agrees with Defendants' interpretation:  section 407(d)(2) requires that a quota established pursuant to section 407(d)(1) must reflect and not exceed the allocation for that sector.  For example, Amendment 28 indicates that the total annual catch limit of red snapper is 13.96 million pounds for 2016 and 13.74 million pounds for 2017.  AR 020322.  That means the commercial sector receives quotas of 6.77 million pounds and 6.65 million pounds in

2016 and 2017, respectively, which reflect an average allocation of 48.5 percent each year.  *Id.*

Similarly, the recreational sector receives quotas of 7.19 million pounds and 7.09 million pounds

in 2016 and 2017, respectively, which reflect an average allocation of 51.5 percent each year.  *Id.*

Amendment 28 thus complies with section 407(d)(2) by ensuring that the quotas reflect and not

exceed the allocations specified for the commercial and recreational sectors.

>       2.   Section 303(a)(1)(A) of the MSA.

Section 303(a)(1)(A) provides that:

> Any [FMP] . . . shall contain the conservation and management measures . . . which
> are . . . necessary and appropriate for the conservation and management of the
> fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore,
> and promote the long term health and stability of the fishery.

16 U.S.C. § 1853(A)(1)(A).  In the same vein, the Reef Fish FMP enumerates the following

relevant objectives: to "rebuild the declining fish stocks wherever they occur within the fishery"

and "increase the stability of the red snapper fishery in terms of fishing patterns and markets."  AR

040093; AR 039435.

>       a)   *The Long-term Health of the Fishery.*

Plaintiffs first argue that Amendment 28 violates section 303(a)(1)(A) because it will cause

declines in the red snapper stock in the Eastern Gulf, thereby failing to "promote the long-term

health . . . of the fishery."  (Doc. No. 18, at 25).  In response, Defendants argue that any decrease

in the red snapper stock in the Eastern Gulf will be offset by increases in the red snapper stock in

the Western Gulf.  (Doc. No. 22, at 25).  That argument, Plaintiffs explain, improperly conflates

Defendants' duties under section 303(a)(1)(A), which requires NMFS to "prevent overfishing and

rebuild overfished stocks" *and* "protect, restore, and promote the long-term health and stability of

the fishery."  (Doc. No. 18, at 26).  According to Plaintiffs, even though the stock will be

considered rebuilt in 2032, the fishery will be substantially depleted in the Eastern Gulf, or in fully

half of its range.   (Doc. No. 18, at 26).   That is particularly so because recreational fishing is concentrated in the Eastern Gulf.   AR 020409 ("Because a higher [recreational] fishing effort occurs in the east . . . reallocation would lead to an increased fraction of the eastern population being removed by fishing.").

Plaintiffs' arguments are unavailing.   Section 303(a)(1)(A) requires that an FMP amendment "prevent overfishing and rebuild overfished *stocks*" and "protect, restore, and promote the long term health and stability of the *fishery*."   16 U.S.C. § 1853(a)(1)(A) (emphasis added). The MSA defines the term "stock" as a "species, subspecies, geographical grouping, or other category of fish *capable of management as a unit*."   *Id.* § 1802(42) (emphasis added).   The MSA defines the term "fishery" as "one or more stocks of fish *which can be treated as a unit for purposes of conservation and management* and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and any fishing for such stocks."   *Id.* § 1802(13) (emphasis added).

Thus, NMFS's "choice of management" for a stock or fishery therefore may be decided on a number of different grounds; it "depends on the focus of the FMP's objectives, and may be organized around biological, geographic, economic, technical, social, or ecological perspectives." 50 C.F.R. § 600.320(d)(1).   The choice of management lies with NMFS.   *Id.*; *see also, e.g.*, *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1119 (9th Cir. 2006) (finding lawful NMFS's distinction between natural and hatchery spawners of salmon even though spawners swam side-by-side and prior management measures did not distinguish between the two).

Here, NMFS, along with the Gulf Council, "currently manages the Gulf red snapper stock as one Gulf-wide stock with a Gulf-wide status determination criteria and a Gulf-wide rebuilding plan." AR 020855.   Accordingly, NMFS's obligation to "promote the long term health . . . of the

fishery" is one that is Gulf-wide.   Given that Amendment 28 does not thwart the "Gulf-wide recovery of red snapper under the rebuilding plan," the Court finds that NMFS fulfills that obligation.   AR 020855; *see also* AR 020409 (explaining that the "effects of increasing the ABC as a result of reallocating to the recreational sector would be to reduce the SPR of the eastern portion of the stock even further;" however, "declines in the eastern stock's SPR are matched with modest gains" in the western stock).[7]

> b)      *The Long-term Stability of the Fishery.*

Plaintiffs next argue that Amendment 28 violates section 303(a)(1)(A) because it will not "promote the long-term . . . stability of the fishery."  (Doc. No. 18, No. 27).  Plaintiffs explain that Amendment 28 will negatively affect the commercial sector's long-term access to red snapper and confidence in the IFQ program.  (*Id.*).

Plaintiffs' argument merely voices dissatisfaction with the reduction of available quota that results from the reallocation.  As Defendants point out, Amendment 28 will not change the existing benefits of the IFQ program, such as season length, ex-vessel prices, no quota overages, enhanced safety at sea, and absence of other race-to-fish (derby) conditions.  (Doc. No. 22, at 26).  The Court therefore views Plaintiffs' arguments as an additional attempt to claim that Amendment 28 is unfair and inequitable, an argument that has already been addressed by this Court.  Furthermore, under the APA, the Court cannot "substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, particularly when the agency's judgment, like here, requires the "expertise and experience of those individuals . . . whom the [MSA] charges with making difficult policy

---

[7]      Plaintiffs additionally argue that Defendants violate the enumerated objective of the Reef Fish FMP that aims to "rebuild the declining fish stocks wherever they occur within the fishery."  (Doc. No. 18, at 26).  In response, Defendants argue that "the Reef Fish FMP identifies only one red snapper stock in the Gulf and establishes a Gulf-wide recovery objective."  (Doc. No. 25, at 6).  The Court agrees with Defendants.  As mentioned, NMFS has chosen to manage the fishery as a Gulf-wide unit.  The record is clear that Amendment 28 will not thwart the Gulf-wide recovery of red snapper.  AR 020855.

judgments," *North Carolina Fisheries Ass'n*, 518 F. Supp. 2d at 80.  The Court therefore defers to

Defendants' analysis to conclude that Amendment 28 complies with section 303(a)(1)(A).

       3.   <u>MSA National Standard One.</u>

National Standard One provides that "[c]onservation and management measures shall

*prevent overfishing* while achieving, on a continuing basis, the optimum yield from each fishery."

16 U.S.C. § 1851(a)(1) (emphasis added).   The term "optimum" with respect to yield from a

fishery, means the amount of fish, which:

> (A) will provide the greatest overall benefit to the Nation, particularly with respect
> to food production and recreational opportunities, and taking into account the
> protection of marine ecosystems; (B) is prescribed on the basis of the maximum
> sustainable yield from the fishery, *as reduced by any relevant social, economic, or
> ecological factor*; and (C) in the case of an overfished fishery, provides for
> rebuilding to a level consistent with producing the maximum sustainable yield in
> such fishery.

16 U.S.C. § 1802(33) (emphasis added).[8]   "Significantly, optimum yield is not defined by the

'maximum sustainable yield' but instead by the maximum sustainable yield *less* whatever amount

need be conserved for economic, social or ecological reasons."   *See C & W Fish*, 931 F.2d at 1563;

*see also Blue Water Fisherman's Ass'n v. Mineta*, 122 F. Supp. 2d 150, 161-62 (D.D.C. 2000).

According to Plaintiffs, Amendment 28 violates National Standard One for two reasons.

First, Amendment 28 hastens the decline of the red snapper stock in the Eastern Gulf, thereby

resulting in a net decrease in conservation of the red snapper stock.  (Doc. No. 18, at 33).  This

argument, however, is unavailing.  The record is clear that such declines in the Eastern Gulf will

be offset by increases in the Western Gulf.  AR 020409.  More importantly, those declines do not

impact the Gulf-wide recovery of red snapper under the rebuilding plan.  AR 020855.

---

[8]     Similarly, the Gulf Council's Fishery Allocation Policy provides that any reallocation shall "promote
conservation" by being "connected to the achievement of [optimum yield]."  AR 020576.  The Court incorporates its
analysis here to conclude that Amendment 28 satisfies the Gulf Council's Fishery Allocation Policy.

Second, Plaintiffs aver that the newly implemented 20 percent buffer imposed on the recreational sector sets aside quota that would otherwise be utilized by the commercial sector. (Doc. No. 18, at 34).[9]  The Court, again, is not persuaded.  The D.C. Circuit has held that "an FMP can comply with [National] Standard [One] if there are social, economic, or ecological factors that justify the pursuit of a yield less than the maximum sustainable yield."  *C & W Fish*, 931 F.2d at 1563.   Here, Defendants contend that Amendment 28 complies with National Standard One because it "promotes recreational opportunities while also ensuring that overfishing does not occur and the red snapper stock continues to rebuild."   (Doc. No. 25, at 14).   The Court finds that Defendants' determination is supported by the record and reflects "reasoned decision making, especially where, as here, the dispute involves technical issues that implicate substantial agency expertise."  *See The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005).

    4.   Section 303(a)(14) of the MSA.

Plaintiffs next maintain that Amendment 28 fails to comply with section 303(a)(14) of the MSA, which provides:

> [Any FMP shall,] to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery.

16 U.S.C. § 1853(a)(14).  Plaintiffs argue that Amendment 28 violates this provision because NMFS failed to consider the specific information—"economic impacts" of the "harvest

---

[9]    Plaintiff rely on *Western Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 139-44 (D. Mass. 2010), to support their contention that Amendment 28 frustrates the achievement of optimum yield of the red snapper stock.  In that case, plaintiffs challenged a regulation that prohibited a vessel with several fishing permits from splitting those permits and transferring them separately to other vessels.  *Id.* at 133-34.  The district court held that the regulation violated National Standard One because, among other things, herring was not overfished.  *Id.* at 140-41.  *Western Sea* is not only not binding on this Court, but also inapposite.  That is because *Western Sea* involved a species that was not overfished nor in danger of overfishing, *id.* at 140, unlike the red snapper in the present case.

restrictions" or "recovery benefits" on the fishery participants—that Congress requires NMFS to consider when allocating recovery benefits.  (Doc. No. 18, at 35).

Importantly, Plaintiffs contend that Defendants' violation under section 303(a)(14) is procedural, rather than substantive.  Defendants do not contest Plaintiffs' characterization of NMFS's obligation under section 303(a)(14) as procedural.  Given the analogous, yet limited, authority on section 303, the Court analyzes section 303(a)(14) as a procedural, not substantive, obligation.  *Cf. Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, 846 F.3d 99, 108 (5th Cir. 2017) (finding that section 303(a)(9) of the MSA is "satisfied where NMFS produces the required assessments, without respect to their conclusions").

Plaintiffs contend that Amendment 28 does not contain an analysis of the specific "economic impacts" that the "participants" in each of the sectors endured or enjoyed as a result of the harvest restrictions or recovery benefits.  (Doc. No. 24, at 18).  Plaintiffs explain that the commercial sector complied with harvest restrictions in 2007, 2008, and 2009 while the recreational sector did not.  (Doc. No. 18, at 35).  Once the stock began to recover in 2010 and catch limits began to increase, the commercial sector continued to comply with the applicable restrictions while the recreational sector did not.  (*Id.*).  As such, according to Plaintiffs, the commercial sector endured a disproportionate share of the harvest restrictions necessary to rebuild the stock while the recreational sector enjoyed a disproportionate share of the recovery benefits once the stock began to recover.  (*Id.*).

The Court disagrees with Plaintiff.  The record is clear that the agency considered the economic impact of each alternative in Amendment 28.  *See, e.g.*, AR 020416 (explaining that the "no-action" alternative would not yield any direct economic effects); *id.* (noting that Alternatives 2-9 would "result in economic losses to the commercial sector and potentially generate economic

benefits for the recreational sector").  The record is also clear that the agency, upon reviewing each alternative in Amendment 28, made an overall conclusion regarding the economic impact of reallocation. After acknowledging the difficulty in comparing the commercial sector with the recreational sector, Defendants concluded that any determinations regarding the economic impact of Amendment 28 would not be valid or useful.  AR 020418 (explaining that policy prescriptions based on inferences about economic efficiency are impossible given that the commercial sector is managed differently than the recreational sector).

The APA precludes the Court from "substitute[ing] its judgment for that of the agency." *State Farm*, 463 U.S. at 43.  As explained, Defendants, having employed their expertise and experience, determined that they could not reach a conclusion regarding the overall economic impact of Amendment 28.  The Court will not second-guess them.  Defendants' conclusions, however, are beside the point given that section 303(a)(14) imposes on NMFS a procedural obligation.  Consequently, the Court need only ask whether Defendants produced the required assessments, without respect to their conclusions.  For the reasons stated above, the Court concludes that Defendants have satisfied that basic obligation.  *See, e.g.*, *Coastal Conservation Ass'n*, 846 F.3d at 109 (explaining that the Secretary is not required to "acquire or produce" the plaintiffs "preferred" data); *Recreational Fishing Alliance v. Evans*, 172 F. Supp. 2d 35, 44 (D.D.C. 2001) ("An agency is not required to collect additional evidence under the [MSA]."); *see also Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1448-49 (9th Cir. 1990) ("There simply is no requirement that the Secretary do what the appellants insist" when it comes to developing and analyzing the effects of an FMP).

5.  Section 303(a)(9) of the MSA.

Section 303(a)(9) of the MSA provides, in relevant part, that any FMP must:

> [i]nclude a fishery impact statement for the plan or amendment . . . which shall
> assess, specify, and analyze the likely effects, if any, including the cumulative
> conservation, economic, and social impacts, of the conservation and management
> measures on, and possible mitigation measures for . . . participants in the fisheries
> and fishing communities affected by the plan or amendment.

16 U.S.C. § 1853(a)(9).  In *Coastal Conservation Association v. U.S. Department of Commerce*,

the Fifth Circuit recently interpreted section 303(a)(9), stating:

> No federal appellate court has yet interpreted the requirements of § 1853(a)(9).
> However, the two district courts that have considered challenges brought under
> § 1853(a)(9) agree that "[t]he FIS requirement is . . . procedural, not substantive,"
> and that it is satisfied where NMFS produces the required assessments, without
> respect to their conclusions. *City of New Bedford v. Locke*, No. CIV. A. 10–10789–
> RWZ, 2011 WL 2636863, at *6 (D. Mass. June 30, 2011), *aff'd sub nom. Lovgren
> v. Locke*, 701 F.3d 5 (1st Cir. 2012); *accord Coastal Conservation Ass'n v. Blank*,
> No. 2:09–CV–641–FTM–29, 2011 WL 4530544, at *7 (M.D. Fla. Sept. 29, 2011)
> ("The issue before the Court in the Section 1853(a)(9) challenge . . . is not whether
> the conclusions on how [the proposed FMP amendment] will likely affect the
> recreational fishing sector are correct. Rather, the issue is whether the [NMFS]
> arrived at the answer only after complying with the obligation to assess, specify,
> and analyze how [the amendment] would likely affect the recreational fishing
> sector.").

846 F.3d at 108.  After agreeing that section 303(a)(9) is procedural and affirming the district

court's analysis, the Fifth Circuit explained that section 303(a)(9) did not impose an affirmative

duty on the Secretary to "collect and generate only quantitative, rather than qualitative, predictions

of economic and social effects."  *Id.* at 108-109 (finding Secretary's interpretation of "data" to

include qualitative as reasonable).

Plaintiffs argue that Defendants violated section 303(a)(9) because they did not "assess,

specify, and analyze" the likely economic and social effects on fishing communities due to

Amendment 28's depletion of the red snapper stock in the Eastern Gulf.  (Doc. No. 18, at 36).[10]

---

[10]     Plaintiffs contend that Defendants admitted to this violation when Defendants stated the following in the
Record of Decision:  "Although the biological issues of the SPR decline is [sic] discussed, Amendment 28 does not
assess the resulting economic and social effects on fishing communities in the Eastern Gulf." AR 020721.  At the
outset, Plaintiffs' argument is unpersuasive when the referenced-portion of the record is stated in full:

Plaintiffs also claim that Defendants couched the social and economic effects "in more general terms as part of, or implied in, the effects analysis," which fails to satisfy section 303(a)(9).  (*Id.*).

Both of Plaintiffs' arguments are unavailing.  Upon review of the record, the Court finds that Defendants assessed, specified, and analyzed the social and economic effects as required.  For example, Defendants first acknowledged that their discussion on social effects would be "qualitative," before concluding that the "quality of social impacts differs between the sectors."  AR 020411.  Specifically, "a loss of commercial access to red snapper could affect the livelihoods of commercial fishermen, especially small-scale owner-operators, hired captains and crew who do not own red snapper shares, and the well-being of commercial communities."  *Id.*  At the same time, "gains in recreational quota would provide additional recreational opportunities to retain red snapper."  *Id.*  Regarding economic effects, as mentioned in the preceding section, Defendants reviewed the economic impact of each alternative to Amendment 28.  Upon finding data that was not sufficiently reliable, Defendants concluded that any policy prescriptions produced from its review would not be useful or valid.  AR 020418.  Furthermore, Plaintiffs cite no law to support its interpretation that section 303(a)(9) precludes Defendants from explaining social and economic effects in general, rather than specific, terms.  For the aforementioned reasons, the Court concludes that Defendants have produced what is required under section 303(a)(9).

---

Although the biological issues of the SPR decline is [sic] discussed, Amendment 28 does not assess the resulting economic and social effects on fishing communities in the Eastern Gulf.  *However, Amendment 28 describes several commercial and recreational fishing communities throughout the Gulf.*  The nature of social and economic effects on the communities are couched in more general terms as part of, or implied in, the effects analysis for each allocation alternative.

AR 020721 (emphasis added).

*C. NEPA.*

Plaintiffs' NEPA claim seeks the same relief sought under the MSA.  Given the Court's decision to vacate Amendment 28 for violating National Standard Four of the MSA, the Court need not decide Plaintiffs' NEPA claims at this time.  *See, e.g. Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 757, 749 (D.C. Cir. 2000) (finding "no need to reach appellants' NEPA claims" where court remanded a rule to NMFS); *Guindon I*, 31 F. Supp. 3d at 201 (same).

## V.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.  The Court **GRANTS** Plaintiffs' Motion for Summary Judgment, and thus **DENIES** Defendants' Motion for Summary Judgment, as to Plaintiffs' claim made pursuant to MSA National Standard Four.

2.  The Court **DENIES**  Plaintiffs' Motion for Summary Judgment, and thus **GRANTS** Defendants' Motion for Summary Judgment, as to Plaintiffs' claims made pursuant to the following MSA provisions: section 407(d)(2); section 303(a)(1)(A); National Standard One; section 303(a)(14); and section 303(a)(9).

3.  Because the Court finds that Amendment 28 fails to conform to the requirements of National Standard Four, the Court **VACATES** Amendment 28 and **REMANDS** this action back to the agency.

**IT IS SO ORDERED.**

Dated: March 3, 2017

*Barbara J. Rothstein*
_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE